**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GENERAL MOTORS L.L.C., and GM
GLOBAL TECHNOLOGY OPERATIONS
L.L.C.,

               Plaintiffs,

                                     Case No. 14-14864

      v.                            HON. TERRENCE G. BERG

AUTEL.US INC., and AUTEL
INTELLIGENT TECHNOLOGY CO., LTD.
and GARY DELUCA,

               Defendants.

_____/

## OPINION AND ORDER DENYING
## DEFENDANTS' MOTION TO DISMISS (DKT. 15)

Plaintiffs General Motors L.L.C. and GM Global Technology Operations L.L.C., (collectively "GM") filed this lawsuit against Defendants Autel.US Inc., Autel Intelligent Technology Co., Ltd., (collectively "Autel")[1] and Gary DeLuca on December 12, 2014, asserting various claims, including trademark and copyright infringement, circumvention of security measures, computer intrusion, breach of contract misappropriation of trade secrets, and unjust enrichment. (Complaint, Dkt. 1). On March 20, 2015, Defendants filed this partial motion to dismiss. (Dkt. 15). Following full briefing, the Court heard oral argument on December 3, 2015. For the reasons that follow, Defendants' motion to dismiss is **DENIED**.

---

[1] The Court will refer to the Autel Defendants collectively as Autel, except as specified.

## I.   FACTUAL AND PROCEDURAL HISTORY

GM is a world-renowned auto manufacturer with its principal place of business in Detroit, Michigan.  (Complaint, ¶ 3).  In addition to manufacturing vehicles, GM offers post-sale products and services to service technicians for the diagnosis and repair of its vehicles.  (*Id.* at ¶ 46).  For this purpose, GM has developed the Techline Information System ("TIS") software.  (*Id.* at ¶ 79).  GM holds copyrights in the various versions of TIS.  (*Id.* at ¶ 80).

In order to access and use GM's TIS software, technicians must obtain a subscription from GM.  (*Id.* at ¶¶ 80-81).  Paying subscribers download the TIS software on their personal computers and then upload it onto GM's "Tech 2" hand-held vehicle diagnosis device.  (*Id.* at ¶¶ 81-83).  Vehicle technicians use the Tech 2 to connect to a GM vehicle's on-board computer systems and read data directly from a vehicle's electronic control modules; the data contains diagnostic trouble codes that guide the vehicle's diagnosis and repair.  (*Id.* at ¶ 84).

The Tech 2 can also "reflash" and re-program vehicles' electronic control modules and "conduct service programming events."  (*Id.* at ¶ 85).  The electronic control modules in GM vehicles are normally "locked" and can only be unlocked by GM's vehicle calibration software.  (*Id.* at ¶ 183).  Subscribers can download the vehicle calibration software, located within TIS, onto their PCs and then load the software onto the Tech 2.  (*Id.* at ¶ 86).  In addition, subscribers can perform these

2

functions directly from their PCs under a GM program called "Tech2Win." (*Id.* at ¶¶ 88-89).

Non-dealership aftermarket technicians obtain access to TIS software, calibration files, and Tech 2 products through a subscription to GM's ACDelco TDS Website ("ACDelco").[2]  (*Id.* at ¶¶ 90-91).  ACDelco is hosted on servers located in this judicial district.  (*Id.* at ¶ 23).  To gain access to ACDelco, users must first create a username and password.  (*Id.* at ¶ 92).  GM only authorizes users in the United States, Canada, and Australia to access ACDelco.  (*Id.* at ¶ 94).

GM requires users to agree to ACDelco's Terms of Use and End Use License Agreement prior to accessing its software.  (*Id.* at ¶ 95).  Users must indicate that they accept these agreements every time they log into ACDelco.  (*Id.* at ¶ 20).  The Terms of Use prohibit users from "reproducing, modifying, adapting, distributing, transmitting, transferring, republishing, compiling or decompiling, [or] reverse engineering" GM's intellectual property contained within ACDelco.  (*Id.* at ¶ 96). Users also "agree to submit to the exclusive personal jurisdiction and venue of the state and federal courts located in Wayne County, Michigan, in any legal action or proceeding."  (ACDelco Terms of Use, Dkt. 1, Ex. A).

Gary DeLuca, a resident of New York, is Vice President of Autel.US. (Complaint, ¶ 1).  Autel.US, a New York corporation, is a wholly-owned subsidiary of Autel ITC, a Chinese corporation.  (*Id.* at ¶¶ 5-8).  Autel, consisting of both

---

[2] In contrast, GM dealerships obtain subscriptions from www.gmglobalconnect.com.   (*Id.* at ¶ 90).

Autel.US and Autel ITC, produces vehicle diagnosis and repair tools that compete with GM's Tech 2 product, including the MaxiDAS DS708 and the MaxiSys Pro MS908P. (*Id.* at ¶ 1).

According to GM, DeLuca, either for himself and or on behalf of Autel, has established at least seven subscription accounts on ACDelco. (*Id.* at ¶ 97). The complaint alleges that he entered these contracts knowing that GM was a Michigan corporation. (*Id.* at ¶ 18). When he established the accounts, DeLuca used his own name along with the address and phone number of Autel.US. (*Id.* at ¶ 99). He then transferred the log-in credentials associated with the accounts to people in China (*id.* at ¶ 102) and accessed ACDelco himself several times. (*Id.* at ¶ 21). The log-in records for the accounts show that they have been used extensively by Chinese users (*id.* at ¶ 101) at a level far above that expected of a legitimate user (*id.* at ¶ 103). For example, during some months the accounts registered thousands of programming events. (*Id.* at ¶ 104).

GM alleges that Autel has used these accounts to download GM's calibration files onto at least the MaxiSys Pro MS908P and that this has allowed Autel's customers to recalibrate the electronic control modules of GM vehicles without paying GM for its software and data. (*Id.* at ¶ 106). GM also claims that Autel has misappropriated its intellectual property through its unlawful access to ACDelco. (*Id.* at ¶ 106).

Autel ITC manufactures its products in China and distributes them through Autel.US in the United States; the products are sold in Michigan.  (*Id.* at ¶ 26). Autel ITC also utilizes the CARQUEST distribution network in Michigan (*id.* at ¶ 30) and maintains an interactive website where Michigan customers can obtain support and software updates for their Autel products (*id.* at ¶ 37).

Based on Defendants' actions, GM filed this lawsuit on December 22, 2014 seeking relief on nine counts, including: (I) trademark infringement; (II) false designation of origin; (III) copyright infringement; (IV) illegal circumvention of security measures; (V) trafficking in illegal means for circumvention; (VI) violation of the Federal Computer Fraud and Abuse Act; (VII) breach of contract; (VIII) misappropriation of trade secrets; and (IX) unjust enrichment.  (Dkt. 1).  On March 20, 2015, Defendants filed this partial motion to dismiss seeking dismissal of Counts IV, V, VI, VIII, and IX.  (Dkt. 15).  Defendants also seek the dismissal of Autel ITC and DeLuca, but not Autel.US, for lack of personal jurisdiction.

## II.  ANALYSIS

### A. Standard of Review

Defendants seek a partial dismissal of GM's complaint under Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(6) for failure to state a claim.

#### 1.  Rule 12(b)(2)

Federal Rule of Civil Procedure 12(b)(2) authorizes the filing of motions to dismiss for lack of personal jurisdiction.  When "[p]resented with a properly

supported 12(b)(2) motion and opposition, the court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir.1991) (citing *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir.1989)). "The court has discretion to select which method it will follow, and will only be reversed for abuse of that discretion." *Id.*

When a defendant challenges personal jurisdiction under Rule 12(b)(2), the plaintiff bears the burden of establishing the existence of personal jurisdiction. *See Int'l Tech. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d 386, 391 (6th Cir.1997). In the face of a properly supported motion for dismissal, the "plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *E & M Props. v. Razorgator, Inc.*, No. 08–CV–10377, 2008 WL 1837261, at *2 (E.D.Mich. Apr. 23, 2008) (quoting *Theunissen*, 935 F.2d at 1458). Because the Court has not conducted an evidentiary hearing, it will construe the facts in the light most favorable to Plaintiff and may not consider conflicting facts offered by Defendant. *See Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir.2002). Further, in the absence of an evidentiary hearing, "the plaintiff must make only a prima facie showing that personal jurisdiction exists in order to defeat dismissal." *Theunissen*, 935 F.2d at 1458.

6

Lastly, a defendant may waive objections to personal jurisdiction, and courts will generally enforce waivers made by agreement. S*ee Preferred Capital, Inc. v. Associates in Urology*, 453 F.3d 718, 721 (6th Cir.2006); *see also Carnival Cruise Lines v. Shute*, 499 U.S. 585, 590–95, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 8–20, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).

## 2. Rule 12(b)(6)

A Rule 12(b)(6) motion tests whether a legally sufficient claim has been pleaded in a complaint, and provides for dismissal when a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

A claim is facially plausible when a plaintiff pleads factual content that permits a court to reasonably infer that the defendant is liable for the alleged misconduct. *Id.* (citing *Twombly*, 550 U.S. at 556). When assessing whether a plaintiff has set forth a "plausible" claim, the district court must accept all of the complaint's factual allegations as true. *See Ziegler v IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). A plaintiff must provide "more than labels and conclusions," or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 556. Therefore, "[t]hreadbare recitals of the elements of a

7

cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## B. Discussion

### 1. Motion to Dismiss for Lack of Personal Jurisdiction

"Where a federal court's subject matter jurisdiction over a case stems from the existence of a federal question, personal jurisdiction over a defendant exists 'if the defendant is amenable to service of process under the [forum] state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant[ ] due process.'" *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (citing *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992)).

"Where the state long-arm statute extends to the limits of the due process clause, the two inquiries are merged and the court need only determine whether exercising personal jurisdiction violates constitutional due process." *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 477 (6th Cir. 2003). Michigan's long-arm statute extends to the limits of due process. *Audi AG & Volkswagon of Am., Inc. v. D'Amato*, 341 F. Supp. 2d 734, 741 (E.D. Mich. 2004) ("The Michigan Supreme Court has construed Michigan's Long–Arm Statute to bestow the broadest possible grant of personal jurisdiction consistent with due process.").

8

"Personal jurisdiction can be either general or specific, depending upon the nature of the contacts that the defendant has with the forum state." *Bird*, 289 F.3d at 873. Here, GM only claims that this Court has specific jurisdiction over Defendants. Specific, or limited, jurisdiction is proper where a defendant's contact with the forum state satisfies the three-part *Southern Machine Company Test*,

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequence caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Bridgeport Music*, 327 F.3d at 477-78 (citing *Southern Machine Co. v. Mohasco Industries, Inc.* 401 F.2d 374 (6th Cir. 1968)). "[T]he crucial federal constitutional inquiry is whether, given the facts of the case, the nonresident defendant has sufficient contacts with the forum state that the district court's exercise of jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Both Autel ITC and DeLuca contend that they are not subject to personal jurisdiction in this Court. The Court will address each in turn.

### a. Autel ITC is Subject to Limited Jurisdiction

This Court has now twice held that it has personal jurisdiction over Autel ITC. In *Service Solutions U.S., L.L.C. v. Autel U.S. Inc.*, No. 13-10534, 2013 WL

5701063, at *6 (E.D. Mich. Oct. 18, 2013), this Court held that Autel ITC was subject to limited jurisdiction in a patent infringement matter based on Autel ITC's importation of allegedly infringing products into the United States and Michigan. Similarly, in *Ford Motor Co. v. Autel US Inc.*, No. 14-13760, 2015 WL 5729067, at *12 (E.D. Mich. Sept. 30, 2015), a case nearly identical to this one, this Court held that Autel ITC was subject to limited personal jurisdiction because of Autel ITC's use of the CARQUEST distribution network to advertise its products in Michigan, and its interactive website that permits Michigan customers to download updates to Autel ITC's products.

GM relies on the same contacts with the forum that were shown in those cases and adds one more: that Autel ITC has reached into Michigan to access GM's intellectual property located on its servers residing in Michigan. (Dkt. 19, p. 9). This is an example of purposeful availment. Not surprisingly, the Court here reaches the same conclusion that it reached in the *Ford* case: Autel ITC is subject to limited personal jurisdiction in this forum. Autel ITC's motion to dismiss for lack of personal jurisdiction is denied.

### b.  *DeLuca is Subject to Limited Personal Jurisdiction*

To establish personal jurisdiction over DeLuca, GM has the burden of showing that (1) DeLuca purposefully availed himself of the privilege of acting in Michigan; (2) the cause of action arises from DeLuca's activities in Michigan; and

(3) that the exercise of personal jurisdiction over DeLuca is reasonable. *See Bridgeport Music*, 327 F.3d at 477-78.

### (i) Purposeful Availment

"[T]he question of whether a defendant has purposefully availed itself of the privilege of doing business in the forum state is the sine qua non for in personam jurisdiction." *CompuServe,* 89 F.3d at 1263 (internal citation omitted) (emphasis omitted). This requirement is met when "the defendant's contacts with the forum state proximately result from actions by the defendant *himself* that create a substantial connection with the forum State, and when the defendant's conduct and connection with the forum are such that he should reasonably anticipate being haled into court there." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)) (internal quotation marks omitted) (emphasis in original). "Courts require purposeful availment to insure that 'random,' 'fortuitous,' or 'attenuated' contacts do not cause a defendant to be haled into a jurisdiction." *Id.* A defendant need not have been physically present in a forum state to have purposefully availed himself of the privilege of doing business in the state. *Id.* at 1264. However, entering into a contract, without more, is insufficient to establish limited jurisdiction. *Id.* at 1265.

11

In *CompuServ*, the Sixth Circuit held that an out-of-state defendant purposefully availed himself of the privilege of doing business in Ohio when he obtained a subscription to a software-sharing website in Ohio and repeatedly submitted his own software for sale on the site. *Id.* at 1263. The defendant had entered into a written contract with the site providing for the application of Ohio law and "perpetuated the relationship . . . via repeated communications" with the website. *Id.* at 1264. The Court noted that the relationship was "intended to be ongoing in nature; it was not a 'one-shot affair.'" *Id.* at 1265. As a result, the Court found "ample contacts" to support the exercise of jurisdiction. *Id.*

DeLuca argues that he did not avail himself of the privilege of doing business in Michigan; he only signed a contract. But the record shows that he did more than that. By obtaining subscriptions for seven different accounts, he signed seven contracts. (Complaint, ¶ 97). Each time he did so, he agreed to ACDelco's Terms of Use—including the terms consenting to jurisdiction in Michigan—and to ACDelco's End User License Agreement. (*Id.* at ¶ 95). And DeLuca obtained these subscriptions in his own name. (*Id.* at ¶ 99). While he listed Autel.US's address and phone number, the complaint does not state that he identified himself in his corporate capacity.

The Terms of Use that he agreed to made DeLuca "solely responsible" for the use of his accounts. (Terms of Use, Dkt. 1, Ex. A). Yet DeLuca allegedly shared his

12

user names with people in China (Complaint, ¶ 20), leading to higher than normal use (*id.* at ¶ 103) and logged on himself several times (*id.* at ¶ 21).

These accounts registered thousands of recalibration events—all attributable to DeLuca as the owner of the subscriptions. (*Id.* at ¶ 104). As explained in the complaint, each recalibration event involves the download of calibration files from GM's TIS software. (*Id.* at ¶¶ 86-89). This is similar to the defendant's continued connections with the website in *Compuserv*, except that unlike the defendant in that case, DeLuca was downloading software from ACDelco, rather than uploading software as in *Compuserv*. Every time one of DeLuca's accounts executed a recalibration event, he was reaching into Michigan because ACDelco is hosted on servers in Michigan. (*Id.* at ¶¶ 90-91). And like those in *Compuserv*, DeLuca's subscriptions allowed his continued use of the website; his relationship was "intended to be ongoing in nature; it was not a 'one-shot affair.'" Because DeLuca created substantial contacts with Michigan, the purposeful availment prong is met.

(ii) Arising From

The "arising from" element "does not require that the cause of action formally arise from defendant's contacts with the forum; rather, this criterion requires only that the cause of action, of whatever type, *have a substantial connections with* the defendant's in-state activities." *Third Nat. Bank in Nashville v. WEDGE Grp. Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989) (emphasis in original) (internal quotation marks omitted). "Only when the operative facts of the controversy are not related

to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact]." *Id.* (internal citation omitted).

DeLuca's contacts with Michigan (broadly defined as the improper attainment of his ACDelco accounts and unauthorized use of the software available from that site) are clearly related to the operative facts of the controversy. Consequently, the cause of action arises from the contacts with the forum.

### (iii)   Reasonable

"[W]hen the first two elements are met, an inference arises that the third, fairness, is also present; only the unusual case will not meet the third criterion." *Third National Bank*, 882 F.2d at 1092.  Nonetheless, the Court must still ensure that its exercise of jurisdiction comports with notions of "fair play and substantial justice." *Burger King*, 471 U.S. at 472.  "A court must consider several factors in this context, including [1] the burden on the defendant, [2] the interest of the forum state, [3] the plaintiff's interest in obtaining relief, and [4] the interest of other states in securing the most efficient resolution of controversies." *Compuserv*, 89 F.3d at 1268 (internal quotation marks omitted.

These factors weigh in favor of jurisdiction.  Although DeLuca is a New York resident, his burden of litigating in Michigan is lessened by the fact that he is represented by the same counsel that represents Autel.  Second, Michigan has a strong interest in protecting Michigan-based companies from unfair competition and trademark and copyright violations.  The third factor also weighs in favor of

14

jurisdiction as GM has an interest in securing relief in its home forum. Finally, because the defendant's alleged actions targeted intellectual property located in Michigan, no other place would be a more appropriate forum to afford an efficient resolution of the conflict.

For the reasons explained above, DeLuca is subject to limited jurisdiction in Michigan. His motion to dismiss for lack of personal jurisdiction is denied.[3]

### 2. Dismissal for Failure to State a Claim

Defendants also claim that GM has failed to state a claim entirely as to DeLuca and failed to state a claim against Autel as to Counts IV, V, VI, VIII, and IX. The Court will address these arguments in turn.

#### a. *GM has Adequately Plead its Claims Against DeLuca*

Defendants argue that GM's claims against DeLuca must be dismissed for two reasons: (1) as a corporate officer, DeLuca is not liable in his personal capacity; (2) GM has not plead that DeLuca personally took any actions.

As a threshold matter, Defendants' first contention is misplaced. "It is well established that a corporate officer or agent is personally liable for torts committed by him *even though he was acting for the benefit of the corporation*." *In re Interstate Agency, Inc.*, 760 F.2d 121, 125 (6th Cir. 1985) (citing *A & M Records, Inc. v. M.V.C.*

---

[3] Although not argued by GM, the Terms of Use's forum selection clause, which requires users to consent to jurisdiction in Michigan, could provide an alternate basis for jurisdiction. Under Michigan law, parties can waive personal jurisdiction through forum selection clauses. *See ViSalus Inc. v. Smith*, No. 13-10631, 2013 WL 2156031, at *5-6 (E.D. Mich. May 17, 2013).

*Distributing Corp.,* 574 F.2d 312, 314-15 (6th Cir.1978) (holding a corporate officer liable for breach of fiduciary duty) (emphasis in original).

In addition to torts, corporate officers may be held liable in their personal capacities for trademark infringement, copyright infringement, and unfair competition. "A trademark, like a patent or a copyright, may be infringed by an individual as well as a corporation and all participants, including those acting merely as officers of a corporation, may be jointly and severally liable." 4 McCarthy on Trademarks and Unfair Competition § 25:24 (4th ed.). "Corporate officers, in a proper case, have been found liable for infringement of a patent, copyright, trademark or trade name." 3A Fletcher Cyclopedia of the Law of Corporations § 1158. "This principle applies where the conduct constitutes unfair competition." *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978).

To be sure, a corporate officer will not be personally liable for "the mere fact of being an officer or director of an infringing corporation." 3A Fletcher Cyclopedia of the Law of Corporations § 1158. Personal liability requires that officers "personally take part in infringing activities or specifically direct employees to do so." 4 McCarthy on Trademarks and Unfair Competition § 25:24 (4th ed.); *accord Coach, Inc. v. D & N Clothing, Inc.*, No. 10-12813, 2011 WL 2682969, at *3 (E.D. Mich. July 11, 2011) ("An individual corporate officer, director, owner, or employee can be liable for trademark infringement by the corporation where the individual is either personally involved in the infringement or is willfully blind to infringing

16

activity.").  It also "generally requires a culpable intent, i.e., the officer or director must actively and knowingly assist or induce the corporations infringement."  3A Fletcher Cyclopedia of the Law of Corporations § 1158.

Defendants rely on authority which is inapposite.  Both *Telling v. Bellows-Claude Neon Co.*, 77 F.2d 584, 585 (6th Cir. 1935) and *FM Industries, Inc. v. Citicorp Credit Servs., Inc.*, No. CIV.A. 07 C 1794, 2007 WL 4335264, at \*4 (N.D. Ill. Dec. 5, 2007) stand for the general proposition that corporate officers are not personally liable solely for the fact that they are officers.  *See Telling*, 77 F.2d at 583 ("an officer of a corporation is not liable for damages and profits on infringement unless he inflicted the wrong otherwise than through the usual relations between officer and corporation, or . . . that infringement by officers must be as individuals before they can be held liable."); *FM Industries*, 2007 WL 4335264 at \*4 ("for personal liability to extend to Brown and Gillard as corporate officers, a special showing must be made that they acted willfully and knowingly, and personally participated in the infringing activities or otherwise used CCSI to carry out their own deliberate infringement.").  Similarly, Nimmer restates the general rule that "an officer of an infringing corporation will be personally liable if he either participates personally (and other than merely in his corporate capacity) in the manufacture and sale of an infringing article[.]"  Nimmer on Copyright § 12.04(A)(1).[4]

---

[4] Defendant also relies on *Ross v. Consumers Power Co.*, 420 Mich. 567, 625-26 (1984).  But *Ross* deals with the scope of governmental immunity under Michigan's Government Tort Liability Act

Applying these principles to the case at bar, it is clear that GM has adequately plead its claims against DeLuca.  GM does not base its claims on the mere fact that DeLuca is the Vice President of Autel.US.  The complaint claims that Deluca "acting individually and/or on behalf of Autel.US" obtained subscriptions *in his name* to AC Delco (Complaint, ¶¶ 16, 99) and transferred the user names related to these accounts to other people within Autel (*id.* at ¶ 102).  It further states that DeLuca did this as part of a scheme to unlawfully access GM's intellectual property contained within ACDelco (*see id.* at ¶¶ 105-06) and that this conduct was "intentional" (*id.* at ¶¶ 23-25).[5]  The complaint clearly alleges that DeLuca was personally involved in the alleged wrongful conduct and that he did this with the intent to facilitate and execute a scheme to harm GM.  Defendants' motion to dismiss GM's claims against DeLuca under Rule 12(b)(6) is therefore denied.

### b.  GM's Claims Against Autel

Defendants also seek dismissal of Counts IV, V, VI, VIII, and IX.  The Court will address the contentions in turn.

---

(GTLA), it does not address the issue of whether and when officers of a private company may be held liable.  Moreover, the holding of *Ross* has been clarified and limited.  *See In re Bradley Estate*, 494 Mich. 367, 389 (2013) ("If the action permits an award of damages to a private party as compensation for an injury caused by the noncontractual civil wrong, then the action, no matter how it is labeled, seeks to impose tort liability and the GTLA is applicable.").

[5] Although these paragraphs refer to Autel's actions, the complaint defines Autel to include DeLuca. (*Id.* at p. 1) ("Plaintiffs General Motors . . . bring their Complaint against Defendants Autel.US Inc. ('Autel.US'), Autel Intelligent Technology Co., Ltd. ('Autel ITC'), and Gary DeLuca ('DeLuca') (collectively, 'Autel' or 'Autel Defendants[.]')").

(i)  <u>GM has Adequately Plead its DMCA Claims in Counts IV and V</u>

GM raises two Digital Millennium Copyright Act ("DMCA") counts against

Autel:  Count IV for circumvention of its copyrights under 17 U.S.C. § 1201(a)(1)(A)[6]

and Count V for trafficking in products designed to circumvent a technological

measure that effectively controls access to a copyrighted work under 17 U.S.C. §

1201(a)(2).[7]

In Count IV, Defendants claim that GM has effectively plead itself out of

court pursuant to the reverse engineering provision of 17 U.S.C. § 1201(f)(1).

Section 1201(f)(1) provides:

> Notwithstanding the provisions of subsection (a)(1)(A), a person
> who has lawfully obtained the right to use a copy of a computer
> program may circumvent a technological measure that effectively
> controls access to a particular portion of that program for the sole
> purpose of identifying and analyzing those elements of the
> program that are necessary to achieve interoperability of an
> independently created computer program with other programs,
> and that have not previously been readily available to the person

---

[6] Section 1201(a)(1)(A) states that "[n]o person shall circumvent a technological measure that effectively controls access to a work protected under this title."

[7] Section 1201(a)(2) provides that "[n]o person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that—

> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title;
>
> (B) has only limited commercially significant purpose or use other than to circumvent a technological measure that effectively controls access to a work protected under this title; or
>
> (C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological measure that effectively controls access to a work protected under this title.

> engaging in the circumvention, to the extent any such acts of
> identification and analysis do not constitute infringement under
> this title.

Setting aside GM's persuasive arguments that it is premature to consider the reverse engineering provision and that Autel waived its right to reverse engineer, the Court finds that GM has not plead itself into the reverse engineering provision.

GM claims that it protects its copyrighted software by requiring authorized users to enter a user name and password to access ACDelco.  (Complaint, ¶ 182). The copyrighted software includes the calibration files that act as a key to allow the reprogramming of otherwise locked electronic vehicle modules.  (*Id.* at ¶ 183).  GM claims throughout its complaint that Autel has unlawfully accessed its software. Accepting these facts as true, as the Court must do at this stage, the reverse engineering provision does not bar GM's claim because this provision requires that a person lawfully obtain the right to use a computer program.

Count V also withstands Autel's Rule 12(b)(6) challenge.  Section 1201(f)(2) provides:

> Notwithstanding the provisions of subsections (a)(2) and (b), a
> person may develop and employ technological means to
> circumvent a technological measure, or to circumvent protection
> afforded by a technological measure, in order to enable the
> identification and analysis under paragraph (1), or for the
> purpose of enabling interoperability of an independently created
> computer program with other programs, if such means are
> necessary to achieve such interoperability, to the extent that
> doing so does not constitute infringement under this title.

GM's complaint does not claim that Autel is circumventing its technological means for the purposes of achieving interoperability with Autel's independently created computer programs. It claims that Autel is taking GM's software and making an illegal copy of it—not that Autel is circumventing its technological security measures for the purpose of achieving interoperability with an independently created computer program. (Complaint, ¶¶ 184-85). This provision is further inapplicable because GM claims that Autel's actions constitute infringement under the DMCA.

Because GM has not plead itself into the reverse engineering provisions, Defendants' motion to dismiss Counts IV and V is denied.

### (ii) GM has Adequately Plead its CFAA Claim

In Count VI, GM alleges that Defendants violated five provisions of the Computer Fraud and Abuse Act ("CFAA"), including 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), (a)(5)(B), (a)(5)(C), and (a)(6). Defendants allege that the Court must dismiss this count because GM has not plead that they acted "without authorization" when they accessed GM's computers and software and because GM has not properly plead statutory damage as required by §§ 1030(a)(5)(B) and (a)(5)(C). The Court will address each contention in turn.

### (a) GM has plead that Defendants acted "without authorization"

Courts disagree on whether the terms "without authorization" under the CFAA should be interpreted broadly or narrowly. Under a broad interpretation, a

party accesses a computer "without authorization" if he violates the computer's terms of use, or breaches a duty of loyalty.  *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 686 (E.D. Mich. 2012).  Under the narrow interpretation, "an employee's misuse or misappropriation of an employer's business information is not 'without authorization' so long as the employer has given the employee permission to access such information."  *Id.*

Courts in this district have adopted the narrow interpretation.  *See Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 687 (E.D. Mich. 2012) ("Accordingly, a violation for accessing 'without authorization' under the CFAA occurs only where initial access is not permitted and a violation for 'exceeding authorized access' occurs only where initial access is permitted but the access of certain information is not permitted."); *Am. Furukawa, Inc. v. Hossain*, 103 F. Supp. 3d 864, 873 (E.D. Mich. 2015) ("The Court agrees with the other courts in this district who have adopted the 'narrow' approach to give meaning to the CFAA's 'without authorization' language.").

Other district courts in this Circuit have likewise read the statute narrowly.  *See Dana Ltd. v. Am. Axle & Mfg. Holdings, Inc.*, No. 1:10-CV-450, 2012 WL 2524008 (W.D. Mich. June 29, 2012); *ReMedPar, Inc. v. AllParts Med., L.L.C.*, 683 F.Supp.2d 605, 609 (M.D. Tenn. 2010); *Black & Decker, Inc. v. Smith*, 568 F. Supp. 2d 929 (W.D. Tenn. 2008).

Even under the narrow interpretation, GM's allegations are sufficient to plead that Autel accessed its systems without authorization. The complaint states numerous times that Autel accessed GM's software "without authorization." (Complaint, ¶¶ 23, 105). It states that DeLuca obtained seven subscriptions and accounts in his own name. (*Id.* at ¶ 99). Although DeLuca used Autel.US's address and phone number when he obtained the subscriptions, Autel does not argue that GM knew or should have known that it was actually Autel who was obtaining these subscriptions. In fact, GM alleges that DeLuca had to transfer his log-in credentials to Autel so that Autel could access ACDelco. (*Id.* at ¶¶ 102, 105). Accepting these allegations as true, GM has plead that Autel did not have authorization to access ACDelco.

As for DeLuca, Autel's argument that his use was authorized under the narrow view carries more force. DeLuca had valid user names and passwords to access ACDelco. However, all of the cases before the Court that interpret "without authorization" narrowly are in the context of an employment relationship. It is unclear whether this interpretation should be applied when the user is not an otherwise authorized employee but is rather an outsider who is allegedly obtaining a subscription for access under false pretenses and in violation of the terms of use. As the parties have not adequately addressed this issue, the Court finds that GM has sufficiently plead that DeLuca lacked authorization for Rule 12(b)(6) purposes.

*(b) GM has adequately plead damage*

Defendants also contend that GM's claims under §§ 1030(a)(5)(B) and (a)(5)(C) should be dismissed because GM has failed to adequately plead "damage" to its computer systems or data as required in the CFAA. Both of these statutory provisions require that a defendant cause "damage" in order to be liable.[8] Section 1030(e)(8) defines the term "damage" as "any impairment to the integrity or availability of data, a program, a system, or information."

Defendants claim that GM has not plead statutory damage because GM is only alleging that Defendants copied and transferred GM's software. Defendants' rely on *NetApp, Inc. v. Nimble Storage, Inc.*, No. 5:13-CV-05058-LHKHRL, 2015 WL 400251, at *11 (N.D. Cal. Jan. 29, 2015) for support. In *NetApp*, the court held that "the mere copying of information does not constitute a claim of 'damage' within the meaning of the CFAA." *Id.* at *14. *NetApp* involved a former employee who copied information from his employer's secured server and transferred it to a non-secure location. *Id.* at *14. The court reasoned that mere copying of information does not "impair the information's 'integrity' as that term is commonly defined." *Id.* at *13. The court also noted that "[t]he majority of district courts to have considered the question agree that the mere copying of information does not plead a recognizable claim of 'damage' under § 1030(a)(5)." *Id.* at 11 (collecting cases). "Moreover, these courts have decided [that] the mere copying of information does not constitute

---

[8] Section 1030(a)(5)(B) applies when a person "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage[.]" Section 1030(a)(5)(C) applies when a person "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss[.]"

'damage' where, as NetApp alleges here, a former employee is accused of taking information from his former employer to give it to a competitor." *Id.* at 12.

However, as *NetApp* acknowledged, "district courts are divided on this issue." *Id.* In fact, a district court in this Circuit has held that the mere copying and transferring of information can be sufficient to establish damage. "[T]he allegations in the Complaint . . . support a finding that the Defendant caused 'damage' . . . when he transferred documents from a secure server to a nonsecure drive." *Black & Decker*, 568 F. Supp. 2d at 937-38. The court explained that the "legislative history of the [CFAA] supports the conclusion that intentionally rendering a computer system less secure should be considered 'damage' under § 1030(a)(5)(A), even when no data, program, or system, is damaged or destroyed." *Id.* at 937.

The Court need not resolve this question here.[9] GM has plead not only that Defendants copied and transferred information from its servers but that DeLuca unlawfully shared his usernames with unauthorized users in China (Complaint, ¶ 102) which led to extensive unauthorized use of the accounts. (*Id.* at ¶¶ 101-104). GM makes a plausible claim that this improper sharing of usernames and subsequent downloading of GM's software for use in a competitor's product caused an impairment to the integrity of their system. GM strictly limited access to ACDelco to paying subscribers in the United States, Canada, and Australia.

---

[9] The Court does note, however, that unlike in *NetApp*, Defendants here were not employees of GM. Whether the copying and transferring of information by *outside parties* and converting such information to the use of the outsiders would be sufficient to establish damage was not addressed by the court in *NetApp*.

(Complaint, ¶ 94). By sharing these accounts, DeLuca arguably impaired the integrity of GM's systems and caused damage.

This conclusion is consistent with *NetApp*. *NetApp* held that the mere copying of information did not constitute impairment because "copying information does not necessarily render computer systems less secure, because copying information on its own does not necessarily allow a hacker to access other systems, programs, or data." 2015 WL 400251 at *14. In contrast, the improper sharing of passwords with outside parties allows unauthorized users—including hackers—access to systems, programs and data that they would not otherwise have.

Accordingly, Defendants' motion to dismiss as to Count VI is denied.

(iii)   GM has Adequately Plead its State Law Claims

Lastly, Defendants seek dismissal of Count VIII for misappropriation of trade secrets under the Michigan Uniform Trade Secrets Act ("MUTSA") and Count IX for unjust enrichment.

GM has adequately plead misappropriation of trade secrets under Count VIII. GM has stated that its trade secrets consist of "vehicle data, data files, data compilations, data arrays, calibration files, lookup tables, software and firmware." (Complaint, ¶ 222). The MUTSA defines a trade secret to include a "formula, pattern, compilation, program, device, method, technique, or process" which:

> (i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

26

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Mich. Comp. Laws § 445.1902(d). Here, GM has plead that its trade secrets are valuable because they help service millions of vehicles "in an efficient and optimum way." (Complaint, ¶ 223). It states that its trade secrets are not generally known and that they derive economic value from not being generally known. (Complaint, ¶ 224). Further, it claims that it "uses reasonable security measures to maintain the secrecy of its trade secrets." (*Id.* at ¶ 226). The Court finds that GM has adequately plead its misappropriation count.

GM has also adequately plead unjust enrichment under Count IX. "Section 8 of the Michigan Uniform Trade Secrets Act ('MUTSA') preempts claims based on conflicting state tort law and provides civil remedies for misappropriation of trade secrets." *Am. Furukawa,* 103 F.Supp. 3d at 884. "The critical inquiry for courts in determining whether a claim is displaced by the MUTSA is whether the claim in question is based *solely* on the misappropriation of a trade secret." *Id.* (emphasis in original). "If a claim is based solely upon the misappropriation of a trade secret, the claim must be dismissed." *Id.* (internal quotation marks and citation omitted).

GM claims that Defendants have "wrongfully benefitted from the development and sale of their competing devices." (Complaint, ¶ 243). This claim is not "based solely" on Defendants' misappropriation of its trade secrets. Throughout its complaint, GM alleges that Defendants' products wrongfully infringe on its

27

trademarks and copyrights.  GM simply does not base its unjust enrichment claim solely on Defendants' alleged misappropriation of its trade secrets.  Unlike in *Ford*, here GM bases its unjust enrichment claim on more conduct than theft of trade secrets.  *Cf. Ford,* 2015 WL 5729067 at *10 ("Plaintiffs state that '[b]y wrongfully acquiring Ford's trade secrets, by misappropriating them for Autel's own use, and by the related wrongdoing, Autel has received a benefit from Ford.'  This claim is based solely on Autel's alleged misappropriation of Ford's trade secrets and accordingly, is preempted by MUTSA.").  Defendants' motion to dismiss GM's state law claims is therefore denied.

### III. CONCLUSION

For the reasons explained above, Defendants' motion to dismiss is **DENIED**.

**SO ORDERED.**

Dated:  March 29, 2016                     s/Terrence G. Berg
                                           TERRENCE G. BERG
                                           UNITED STATES DISTRICT JUDGE

### Certificate of Service

I hereby certify that this Order was electronically submitted on March 29, 2016, using the CM/ECF system, which will send notification to all parties.

                                           s/A. Chubb
                                           Case Manager

28